

# Empowerment and Responsibility:

## Legislative Powers to Strengthen Wales

March 2014



**Commission on Devolution in Wales**
**Comisiwn ar Ddatganoli yng Nghymru**

EXHIBIT 2

EXHIBIT 2

# Contents

Foreword                                                                                    1

Chapter 1 – Our remit and approach                                                          3

Chapter 2 – Current devolution arrangements                                                11

Chapter 3 – Principles for Welsh devolution                                                 25

Chapter 4 – Model of devolution                                                             30

Chapter 5 – Intergovernmental relations                                                     45

Chapter 6 – Economic powers                                                                 58

Chapter 7 – Transport                                                                       64

Chapter 8 – Natural resources                                                               75

Chapter 9 – Broadcasting                                                                    95

Chapter 10 – Policing and justice                                                          103

Chapter 11 – Health and social security                                                    126

Chapter 12 – Further matters                                                                133

Chapter 13 – The National Assembly for Wales and UK Parliament                              148

Chapter 14 – Public sector capacity                                                         164

Chapter 15 – Implementation                                                                 170

Chapter 16 – Overall impact and looking to the future                                       175

Full list of recommendations                                                                185

Annex A – Commissioners' biographies                                                        193

Annex B – Evidence received                                                                 197

Annex C – Schedule 7 of the Government of Wales Act 2006 (as of 1 January 2014)             205

Bibliography                                                                                218

EXHIBIT 2

EXHIBIT 2

# Foreword



The Commission that I have the honour to chair has a fundamental belief that power brings responsibility, and that the only purpose of the exercise of power ought to be the benefit of the citizen. Our well-received First Report dealt with financial matters in that context. This Report is painted on a wider canvas, but is suffused with the same ideas of empowerment, responsibility and a stronger Wales.

Grounded on clear principles, we have articulated a vision of new powers for Wales so that appropriate legislative choices are exercised at the Welsh level, in the interests both of the people of Wales and of the wider United Kingdom. We have also recommended ways in which the governmental and parliamentary institutions in Cardiff and London ought to collaborate.

Necessarily this Report deals with processes. We realise that people are more interested in outcomes. Our intention has been to settle the process questions in the hope that our recommendations will excite all those who want to see what some might regard as a rather sterile debate about distribution of powers replaced by a debate about how those powers can best be exercised.

It has been a pleasure to work with my fellow Commissioners. Their experience, wisdom and open-mindedness have been crucial to our work. Equally crucial has been the input of our able and committed staff. Organisations and individuals up and down Wales and beyond have generously given us their advice. Commissioners have listened, read and discussed over many months. That process of deliberation has meant that we can again present a unanimous Report, and so assert that our recommendations will have a wide degree of support.

In the Foreword to our First Report, I said that it was a privilege and a responsibility to be commissioned by the United Kingdom Government to make recommendations that could affect the lives of every single fellow citizen of Wales. The privilege and the responsibility have become only greater in this second part of our work where we were specifically charged to make recommendations that will better serve the people of Wales. But we are confident that we have discharged our commission, and I am again proud to commend our Report to Her Majesty's Government for implementation.

Paul Silk
March 2014

EXHIBIT 2

EXHIBIT 2

# Chapter 1 – Our remit and approach

**1.1    OVERVIEW**

1.1.1    This chapter outlines the Commission's remit, how we approached our work and our evidence-gathering process.

**1.2    BACKGROUND AND ESTABLISHMENT OF THE COMMISSION**

1.2.1    Since the creation of the National Assembly for Wales in 1999, devolution in Wales has evolved through a number of phases. Polling consistently suggests a settled acceptance of the National Assembly and the Welsh Government as parts of the political landscape in Wales. Changes in and reviews of the devolution arrangements across the United Kingdom have also taken place over the last fifteen years. These reviews and changes are discussed in further detail in Chapter 2.

1.2.2    Following the UK General Election in May 2010, the Conservative and Liberal Democrat parties formed a coalition government. The Coalition Agreement included a commitment that, depending on the result of the March 2011 referendum on primary legislative powers for the National Assembly, a process similar to the Calman Commission[1] would be established for Wales.

1.2.3    On 3 March 2011, the Welsh public voted in favour of the National Assembly having primary legislative powers. Our Commission was duly established by the UK Government a few months later, on 11 October 2011. The setting up of the Commission, and its terms of reference, were supported by the Welsh Government and by all four political parties represented in the National Assembly.

**1.3    REMIT**

1.3.1    The Commission's remit was divided into two parts. Our terms of reference are set out in Box 1.1 below.

---

[1] The independent Commission on Scottish Devolution (the 'Calman Commission') was set up in 2008 to look at the provisions of the Scotland Act 1998 and to recommend changes to the devolution settlement in Scotland. It is discussed further in paragraph 2.3.6 of this report.

EXHIBIT 2

> **Box 1.1: Terms of Reference**
>
> An independent Commission will be established to review the present financial and constitutional arrangements in Wales. It will carry out its work in two parts:
>
> **Part I: Financial Accountability**
>
> To review the case for the devolution of fiscal powers to the National Assembly for Wales and to recommend a package of powers that would improve the financial accountability of the Assembly, which are consistent with the United Kingdom's fiscal objectives and are likely to have a wide degree of support.
>
> **Part II: Powers of the National Assembly for Wales**
>
> To review the powers of the National Assembly for Wales in the light of experience and to recommend modifications to the present constitutional arrangements that would enable the United Kingdom Parliament and the National Assembly for Wales to better serve the people of Wales.[2]

### Part I

1.3.2   For Part I, we were asked to consider the financial powers of the National Assembly to increase its accountability. On 19 November 2012, we published our first report *Empowerment and Responsibility: Financial powers to strengthen Wales*. The report was unanimous. It made 33 recommendations on taxation and borrowing powers for the National Assembly and on related financial matters.

1.3.3   We were pleased that the report gained all-party support, and was endorsed unanimously in the National Assembly. It was also well-received more generally, with a warm response from business representatives and other interested groups. An initial response to the first report was given by the Prime Minister and the Deputy Prime Minister when they visited Cardiff on 1 November 2013,[3] and a formal response was published on 18 November 2013.[4] Of the Commission's thirty-three recommendations, thirty-one were for the UK Government to consider and thirty were accepted in full or in part. The Welsh Government has accepted the recommendation to establish a Welsh Treasury, and the National Assembly has begun work to increase Members' capacity for scrutiny of greater financial powers. We look forward to the consideration of the UK Government's draft Bill.[5]

---

[2] It goes on to state that *"In undertaking Part II, the Commission should:*
  - *examine the powers of the National Assembly for Wales, and in particular:*
    - *the boundary between what is devolved and non-devolved;*
    - *whether modifications to the boundary should be made at this stage; and*
    - *any cross-border implications of such modifications;*
  - *consult widely on any proposed modifications to the current boundary;*
  - *make recommendations on any modifications to the settlement likely to have a wide degree of support; and*
  - *consider and make recommendations on how best to resolve the legal and practical implementation issues from those modifications.*

  *The Commission will not consider... in part II, the structure of the National Assembly for Wales, including issues relating to the election of Assembly Members".*

[3] GOV.UK website (2013) *Powers for Wales in biggest devolution in decades*

[4] HM Government (18 Nov 2013) *Empowerment and Responsibility: Devolving financial powers to Wales*

[5] The Draft Wales Bill was published on 18 December 2013.

EXHIBIT 2

*Part II*

1.3.4   Following the publication of our first report, we began work on Part II of our remit to review the non-financial and wider powers of the National Assembly.

1.3.5   We approached our task with open minds. As a Commission we felt that it was our responsibility to take full account of the views presented to us and that this was a duty owed to those who provided evidence to us. The 'modifications to the present constitutional arrangements' that we recommend under our terms of reference seek to reflect this.

1.3.6   Throughout our work in Part II, we have emphasised that our task was to consider the principle of where powers should rest, and not to assess policy delivery.

*Membership*

1.3.7   Paul Silk was appointed by the Secretary of State for Wales to chair the Commission. He was joined by seven other Commissioners in Part II.[6] Four Commissioners were appointed independently of political parties (Trefor Jones CBE CVO, Professor Noel Lloyd CBE, Helen Molyneux and the Chair), and four were nominated by the political parties in the National Assembly (Nick Bourne, subsequently Lord Bourne of Aberystwyth, the Welsh Conservative nominee; Jane Davidson, the Welsh Labour nominee; Dr Eurfyl ap Gwilym, the Plaid Cymru nominee; and Rob Humphreys, the Welsh Liberal Democrat nominee). Biographies of the Commission members can be found in Annex A.

1.3.8   A small secretariat of officials, drawn from the Wales Office, the Welsh Government and HM Treasury, supported the Commission. The Commission had a budget of approximately £1 million to fund both parts of its work. The Commissioners are unpaid and have been conscious to avoid unnecessary expenditure.

1.3.9   We should like to thank publicly the members of the secretariat for their hard work and efforts in supporting the Commission. Our work would have been impossible without their commitment, good humour and intellectual contribution.

## 1.4   OUR APPROACH

1.4.1   The Commission held one or two day formal meetings every three weeks in Cardiff and also held meetings across Wales and in London. Minutes of our meetings are available on our website.

1.4.2   We were as open and transparent as possible about our work and approached our task in a consensual manner. We were also determined to produce an evidence-based report likely to command a wide degree of support.

1.4.3   Our remit for Part II was very wide and we therefore felt it was important to hear as many views as possible to help inform our work and deliberations.

---

[6] Former Welsh Assembly Government Finance Minister Sue Essex, nominated by Welsh Labour, and Dyfrig John CBE, an independent member and Chair of the Principality Building Society, stood down from the Commission at the end of Part I.

EXHIBIT 2

*Awareness raising*

1.4.4  In order to raise awareness of our work and to give as many people as possible the opportunity to share their views with us, we agreed a wide-ranging communications and public engagement strategy. We used a variety of communication tools to implement this and to encourage debate on the important issues within our remit.

1.4.5  We engaged actively with the media. We issued regular press releases and a communiqué following every Commission meeting and we provided a number of articles for national and regional papers to promote our work. The Chair and other Commissioners undertook press, radio and television interviews and this helped us build a good profile and promote debate.

1.4.6  Our website (http://commissionondevolutioninwales.independent.gov.uk and http://comisiwnarddatganoliyngnghymru.independent.gov.uk) hosts a wide range of information about the Commission's work. This includes the publication of all evidence submitted to us, together with the agendas and minutes of all our meetings. The interactive section of our website also provided another method for people to engage with us.

1.4.7  Our Twitter account (@silkcommission) enabled us to provide short updates to our followers and signpost people to the different ways to become involved in the debate. We regularly tweeted throughout Part II and used twitter to provide links to key documents and related sites and articles relevant to our work.

1.4.8  In order to summarise the Commission's work and to highlight the ways to submit views, we produced a short information pamphlet setting out the Commission's remit and the current devolution arrangements. This was distributed at all our public events.

1.4.9  We placed advertisements in national and regional newspapers to promote our call for evidence and our public events. We also arranged all-Wales radio advertisements, through Real Radio, to promote our public events.

1.4.10  A questionnaire was developed to gather views and evidence. This was used to support our public events and was available in hard copy and online. Questionnaires could be submitted until 27 September 2013 and we received over 500 responses. An analysis paper summarising the responses is available on our website under the 'papers' tab.

1.4.11  Our website hosted a number of different forums inviting people to join the debate. We held six different debates during Part II and received seventy responses.

*Evidence gathering*

1.4.12  In November 2012, we issued an initial Call for Evidence to nearly 800 interest groups and organisations, inviting contributions by 1 March 2013. We included our terms of reference in this and purposely kept the Call for Evidence general in order to encourage a wide range of views. Once we had identified the main issues presented in the evidence received, we wrote out again to any organisations or individuals with relevant knowledge from whom we had not yet heard.

1.4.13  We were pleased to receive over 200 submissions. A list of those who submitted evidence to us can be found in Annex B. The range and quality of the submissions have been very helpful to us, and we have been impressed with the number of thoughtful responses that we received.

EXHIBIT 2

1.4.14  Though a wide variety of views were presented, it was noteworthy that many pieces of evidence related to the same topic areas. This meant we could focus our task and begin thinking about the issues that merited particular consideration and further examination. The choice of topic areas for further consideration was thus based on the evidence presented to us.

1.4.15  We invited expert opinion on these topic areas. Oral evidence was given to us and we also arranged less formal specific expert sessions[7] with academics and stakeholders to assist with our deliberations. Notes of these sessions are available on our website. We also sought international evidence: for example, we engaged with the Forum of Federations, the international organisation focussed on comparative multi-level governance.

1.4.16  In this report, we have summarised in boxes some of the evidence that we received on specific topic areas. These summaries aim to provide a flavour of the views presented to us; they are not a comprehensive summary of the evidence that we received on each topic. However, we have taken full account of all the evidence we have received. As mentioned in paragraph 1.4.6, all evidence submitted to us is available on our website.

1.4.17  We also sought evidence from the UK and Welsh Governments on the costs associated with the proposals we were considering. We have referred to this evidence throughout the report, though we appreciate that any costings should be treated as indicative only. Further work by the two Governments will be necessary if they decide to take forward our recommendations.

### *Public Events*

1.4.18  We wanted to hear the views of the public across Wales and held a series of public events throughout the country. Our public events took place mainly during May and June 2013.

1.4.19  Events of different types were held at different times of the day in order to cater for the needs of as many people as possible. These included information drop-in sessions, a business breakfast and evening public meetings. We encouraged those who attended to debate, ask questions, share their views and speak directly with Commissioners. An extremely wide range of opinions was presented to us through these public events, often passionately and robustly.

1.4.20  Over 400 people attended our public events and a summary of the points raised is available on our website under the 'papers' tab.

1.4.21  Commissioners also made themselves available to attend public meetings that were arranged by a range of community and business organisations.

---

[7] Expert sessions were held on broadcasting, transport, economy, policing, models of devolution, natural resources and criminal justice.

EXHIBIT 2



**Box 1.2: Our public events**

## Part II Public Events - May to June 2013

EXHIBIT 2

### Stakeholder Engagement

1.4.22  We regarded engagement with elected representatives as being of high importance. Thus, throughout Part II, regular briefing sessions were held for Assembly Members and Members of both Houses of Parliament (including Members of Parliament representing constituencies in England close to the border). These were opportunities for us to hear and take account of their views, and for us to provide updates on our work.

1.4.23  Commissioners attended and gave key-note speeches at a number of conferences and events organised by various organisation, including the Legal Wales conference, UK's Changing Union,[8] the British Academy, National Eisteddfod and a debate on devolution within the United Kingdom at the Hay Festival. We participated in events aimed at gaining the views of young people - for example, the Urdd's youth forum with over 40 young people attending and a debate at the Funky Dragon's annual residential event. We also contributed articles to various journals and websites, including the London School of Economics and Political Science's politics blog and the '*Click on Wales*' site run by the Institute of Welsh Affairs.

### Opinion poll

1.4.24  It was also important for us to gather statistical data on public opinion on Welsh devolution and we decided to commission a public opinion survey, as we had done for Part I. An open tender exercise was conducted through the Government Procurement Service and we appointed Beaufort Research Ltd to undertake the poll.

1.4.25  The researchers first held focus groups throughout the country to test and refine the questions to be used in the final opinion poll. Beaufort Research then interviewed a representative sample of 2,009 members of the Welsh population aged 16 and above by telephone between 21 May and 12 June 2013. The sample was statistically representative of the Welsh general public.

1.4.26  The results were broadly consistent with previous polls on attitudes to Welsh devolution and the powers of the National Assembly.[9] The poll showed that a majority of the Welsh public believed the National Assembly has provided a strong voice for Wales and 62 per cent would like to see further powers devolved over a period of time.

1.4.27  Some of the poll's key findings are reflected in the evidence boxes throughout this report. The full opinion poll report can be found on our website.

### Developments elsewhere in the United Kingdom

1.4.28  Our task was to consider devolution in Wales, but Welsh devolution has to be seen within the context of a United Kingdom that is in a continuing process of constitutional change. We needed to take account of what is happening in Scotland and Northern Ireland in particular, but also of concerns in England, at the levels both of cross-border issues and of wider constitutional reform.

---

[8] The UK's Changing Union project is a joint initiative between the Wales Governance Centre at Cardiff University, the Institute of Welsh Affairs and Cymru Yfory/Tomorrow's Wales. In addition to their written evidence to us they have published a number of research papers relevant to our work.

[9] Professor Roger Scully (2013) *Elections in Wales blog.*

EXHIBIT 2

1.4.29   We visited Scotland and Northern Ireland to learn about their devolution experiences. These visits were invaluable in helping us with our deliberations, and we are most grateful to those who gave us the benefit of their experiences.

1.4.30   In Scotland, we met Scottish Ministers and officials; the Deputy Presiding Officer of the Scottish Parliament; the Leaders of the Scottish Conservatives and Scottish Liberal Democrats; members of the Scottish Labour Shadow Cabinet; Reform Scotland; broadcasters; and academics.

1.4.31   In Northern Ireland, we met the First Minister; the Justice Minister; the Permanent Secretary of the Justice Department, Northern Ireland Executive; the Speaker of the Northern Ireland Assembly; officials from the North-South Ministerial Committee; the Law Society of Northern Ireland; the Northern Ireland Law Commission; broadcasters; and academics.

### *Research and analysis*

1.4.32   Our report is firmly founded on the evidence that we received, in writing and orally, on what we heard at our public events, and on our opinion poll. We were able to draw on research by others and analysis presented in other reports such as those of the Calman[10] and Richard Commissions.[11] Our secretariat also prepared several analysis papers. A number of their research papers are available on our website.[12]

1.4.33   As a Commission, it was our task to assess all that we heard and read, and to apply our judgement, knowledge and experience in the preparation of our report and making of our recommendations. We have done this, and we are pleased that our report is unanimously agreed by us all.

### 1.5     SUMMARY

1.5.1   We were as open and transparent as possible about our work and approached our task in a consensual manner. We were also determined to produce an evidence-based report likely to command a wide degree of support. We received over two hundred written submissions and over five hundred questionnaire responses; we met over four hundred people at public events; our opinion poll covered two thousand people across Wales; and we took oral evidence from a large number of interested organisations and experts.

1.5.2   We should like to thank most warmly all who engaged with us throughout both parts of our work. The views submitted to us have been extremely valuable in helping us reach recommendations that are evidence based, and that, we believe, are likely to command a wide degree of support.

---

[10] The Commission on Scottish Devolution (2009) *Serving Scotland Better: Scotland and the United Kingdom in the 21st Century.*

[11] The report of the Richard Commission (2004) *Commission on the powers and electoral arrangements of the National Assembly for Wales.*

[12] Papers include a summary of our questionnaire responses; history of devolution in Wales; current devolution settlements in the United Kingdom; and international evidence.

EXHIBIT 2

# Chapter 2 – Current devolution arrangements

## 2.1    OVERVIEW

2.1.1    In this chapter we describe the current devolution arrangements in Wales and their historical context. We also provide an overview of the devolution settlements in Scotland and Northern Ireland and developments in England. We also assess international evidence. Finally we consider the wider context in which devolution currently operates within the United Kingdom.

## 2.2    DEVOLUTION IN WALES

### Background

2.2.1    During the last century Wales developed greatly as an administrative unit within the United Kingdom. In 1907 a Welsh department was created within the Board of Education in London, the beginning of a process of decentralisation within the UK Government that would lead to the establishment of the Welsh Office in 1964.[13] This process included establishing a Welsh Insurance Committee, Welsh Board of Health, and Council of Agriculture for Wales. The establishment of the Council of Wales and Monmouthshire in 1948 provided a forum for a more general consideration of matters of importance to Wales and encouraged better coordination of the UK Government's activities in Wales.

2.2.2    The Welsh Office, headed by a Secretary of State for Wales, was established in 1964. It held responsibility for local government, planning, housing, water, forestry, parks, the Welsh language, regional economic planning and highways, with tourism, health, agriculture and education added later.

2.2.3    Responding to the increasing interest in self-government in Scotland and Wales, the UK Government established the Royal Commission on the Constitution in 1969. The Kilbrandon Commission, as it was known, recommended the establishment of an Assembly for Wales in its 1973 report. This was offered to the Welsh people in a referendum in 1979. The proposed Welsh Assembly was rejected by 79.7 per cent to 20.3 per cent.

2.2.4    In the final quarter of the last century, momentum increased towards establishing a democratically elected Assembly for Wales. A second referendum was held in 1997, and this voted in favour of devolution by 50.3 per cent to 49.7 per cent. This meant the Welsh Office's direct role in the governance of Wales (with the vast majority of its staff) was passed on to a form of devolved government for Wales. A small UK Government Department, the Wales Office, was created at the same time.[14]

---

[13] See James Mitchell (2011) *Devolution in the UK*, page 42.

[14] The current role of the Wales Office is discussed in paragraph 14.2.5 of this report.

EXHIBIT 2

2.2.5   Devolution in Wales has seen three distinct phases.[15] The initial phase of devolution was that set out by the Government of Wales Act 1998, which provided for a National Assembly for Wales first elected in 1999. The Government of Wales Act 1998 is summarised in Box 2.1.

> **Box 2.1: The Government of Wales Act 1998**
>
> The Government of Wales Act 1998 created the National Assembly for Wales. The National Assembly was a body corporate that had no primary legislative powers. Instead it was given executive powers that allowed the National Assembly to make secondary legislation in eighteen areas. These areas were broadly based on the administrative powers of the Welsh Office. Powers were transferred to the National Assembly through Transfer of Functions Orders. Between 1999 and 2006, the National Assembly was dependent on the UK Parliament if it wanted primary legislation to be passed in relation to Wales.

2.2.6   The White Paper which set out the UK Government's proposal for a National Assembly in 1997 promised that '*a directly elected Assembly will assume responsibility for policies and public services currently exercised by the Secretary of State for Wales*'.[16] Therefore the powers of the National Assembly broadly corresponded with the previous responsibilities of the Secretary of State for Wales. These had been accumulated in an incremental fashion over time prior to devolution. This allocation of powers was summarised by a leading expert on devolution in 2005: '*Based originally for reasons of short-term political and administrative convenience on the informal distribution of functions to the Welsh Office happening over many years, the allocation of law making powers to the Assembly has been typically piecemeal and ad hoc in character, displaying little regard for the constitutional value of intelligibility*'.[17]

2.2.7   In 2002, the First Minister of the National Assembly for Wales, who headed a Labour-Liberal Democrat Partnership Government, appointed the Commission on the Powers and Electoral Arrangements of the National Assembly for Wales. This was better known as the Richard Commission, after its Chair, Lord (Ivor) Richard. The Richard Commission reported in March 2004, less than five years after the first National Assembly was elected, and made a number of recommendations for an improved devolution settlement for Wales. Their proposals for a legislative Assembly for Wales, based on the reserved powers model and separate to the executive, were summarised in their report. This summary is replicated in Box 2.2.

---

[15] For more details see the research paper on the history of Welsh devolution on the Commission website.

[16] *A Voice for Wales: The Government's proposals for a Welsh Assembly* (July 1997) Cm 3718.

[17] 'The Welsh experience', Richard Rawlings (2005) *Devolution, Law Making and the Constitution*, ed. R Hazell and R Rawlings.

EXHIBIT 2

**Box 2.2: The Richard Commission's proposals for a legislative Assembly for Wales**

- Wales Bill needed to amend Government of Wales Act and confer primary law-making powers on the Assembly;

- Bill specifies reserved matters (Westminster legislates); everything is devolved to the Assembly unless specifically reserved;

- reserved matters could include: the Constitution, defence, fiscal and monetary policy, immigration and nationality, competition, monopolies and mergers, employment legislation, most energy matters, railway services (excluding grants), social security, elections arrangements (except local elections), most company and commercial law, broadcasting, equal opportunities, police and criminal justice;

- devolved matters: the fields set out in Schedule 2 of Government of Wales Act [1998] i.e. health, education and training, social services, housing, local government, planning, culture, sport and recreation, the Welsh language, ancient monuments and historic buildings, economic development, industry, tourism, transport, highways, agriculture, fisheries, food, forestry, environment, water and flood defence;

- corporate body structure replaced with executive and legislature;

- Assembly can construct its own rules of procedure and Standing Orders, adopted by a majority of two thirds;

- executive powers in a particular field can be devolved even if the Assembly has no corresponding primary legislative powers;

- Cardiff legislative programme might contain around four to six government Bills a year;

- change in Membership and electoral system [increase to 80 members, elected by the Single Transferable Vote];

- option of tax-varying power.

2.2.8   The second phase of devolution followed after the Richard Commission had reported to the First Minister. The UK Government published a White Paper *Better Governance for Wales* in 2005. The White Paper responded to the call for a separation of the executive from the National Assembly, and to the call for the Assembly to have law-making powers. Legislation followed in the Government of Wales Act 2006, summarised in Box 2.3. This separated the legislature from the executive, creating the Welsh Assembly Government, and gave the National Assembly for Wales restricted powers to establish primary legislation in specified areas.

2.2.9   At this point, the powers devolved to the National Assembly were not reappraised to any substantial extent. As set out in *Better Governance for Wales*:

*'The Government is committed to ensuring that the Assembly has the tools to deliver change in the areas for which it has responsibility. We are therefore proposing to give the Assembly, gradually over a number of years, enhanced legislative powers in defined policy areas where it already has executive functions.'*

EXHIBIT 2

**Box 2.3: The Government of Wales Act 2006**

The Government of Wales Act 2006 formally separated the National Assembly for Wales and the Welsh Assembly Government into legislature and an executive. It also repealed Section 1 of the Government of Wales Act 1998 which had established the National Assembly as a body corporate.

The Act also conferred on the National Assembly restricted primary law-making powers. This meant that, from the 2007 elections, the National Assembly had powers to make Assembly Measures on any "Matter" within the twenty devolved "Fields" in Schedule 5 of the Act. Before a Matter could be legislated on, it had to be specifically listed within the Field in Schedule 5 either through provisions in an Act of the UK Parliament or through a complicated procedure known as a "Legislative Competence Order".

The 2006 Act also contained provisions for a process leading to a referendum on the introduction of primary legislative powers in all devolved areas.

2.2.10   The separation of the National Assembly and Welsh Assembly Government meant that the executive powers that were first granted to the National Assembly between 1999 and 2006 were transferred to Welsh Ministers in the Welsh Assembly Government. Executive powers continued (and still continue) to be granted to Welsh Ministers either through Transfer of Functions Orders or Acts of the UK Parliament. This means that the legislative functions of the National Assembly do not necessarily coincide with the executive functions of the Welsh Ministers.

2.2.11   The first Welsh Assembly Government elected following the 2006 Act, a coalition between Labour and Plaid Cymru, established the All Wales Convention, chaired by Sir Emyr Jones Parry. The Convention was tasked with gauging public understanding of the devolution settlement and assessing whether a referendum on full law making powers, as provided for in the Act, would be successful. It concluded that the settlement was not well understood, and "that a 'yes' vote in a referendum was obtainable", though that was not a certainty.[18] Box 2.4 summarises how the referendum came about and what its results were.

---

[18] *All Wales Convention Report* (2009), page 100.

EXHIBIT 2

**Box 2.4: The 2011 Referendum[19]**

On 9 February 2010, the National Assembly for Wales began the referendum process with 53 Assembly Members voting in favour and none against. The referendum was held on 3 March 2011, with 63.5 per cent of votes in favour of enhanced legislative powers for the National Assembly.

In practice, this meant that the National Assembly would have power to legislate over the "Subjects" listed in Schedule 7 of the Government of Wales Act. These Subjects would be the same as the Fields listed under Schedule 5 of the Act, but there would no longer be a need to request devolution of specific Matters within a Field. Instead, if a Subject was listed under Schedule 7, the National Assembly had competence to legislate on any issue relating to that Subject as long as it was not listed as an Exception under the Act.

A number of Assembly Acts have been passed since the changes in the legislative powers of the National Assembly were introduced. These have succeeded the Assembly Measures previously available.

2.2.12   The 'yes' vote in the 2011 referendum on enhanced law-making powers marked the beginning of the third, and current, phase of devolution. Coincidentally, this was the year by which the Richard Commission recommended the changes it proposed should be implemented.

2.2.13   While Wales is still governed by the Government of Wales Act 2006, the powers of the National Assembly are now those set out in Schedule 7 of the Act. This superseded Schedule 5, which set out the scope of the devolution settlement as it was amended incrementally. The National Assembly now has full law making powers in the twenty areas that have been devolved to Wales (subject to exceptions as set out below). As the then Secretary of State wrote in a November 2010 memorandum to the House of Commons Welsh Affairs Committee, prior to the referendum:

*'In general, the Assembly's legislative competence is described in broader terms in Schedule 7 than in Schedule 5. This is because Schedule 7 describes the full range of legislative competence which would be devolved to the Assembly in the event of a "yes" vote in next year's referendum and the Assembly Act provisions coming into force. Those descriptions are necessarily broad brush given the breadth of the powers involved. Schedule 5 in contrast describes the specific areas of competence which the Assembly has currently, and usually provides a more detailed description of that competence given its much narrower scope'.[20]*

---

[19] A good outline of the referendum in a context of the development of devolved politics in Wales can be found in Richard Wyn Jones and Roger Scully (2012) *Wales Says Yes: Devolution and the 2011 Welsh Referendum*.

[20] Annex to the Welsh Affairs Committee's 2010 report on *The proposed amendment of Schedule 7 to the Government of Wales Act 2006*.

EXHIBIT 2

*The Current Settlement*

2.2.14   The system of devolution in Wales is based on the conferred powers model, meaning the UK Parliament has specified subject areas in which it has granted the National Assembly law-making powers (discussed further in Chapter 4). Schedule 7 of the Government of Wales Act 2006 sets out the twenty areas in which the UK Parliament has transferred legislative power to the National Assembly. They are summarised in Box 2.5. Through these twenty areas the National Assembly has responsibility for a wide range of domestic policies.[21]

---

**Box 2.5: Devolved subjects in Schedule 7**

The 20 devolved subjects are:

1.  Agriculture, forestry, animals, plants and rural development
2.  Ancient monuments and historic buildings
3.  Culture
4.  Economic development
5.  Education and training
6.  Environment
7.  Fire and rescue services and fire safety
8.  Food
9.  Health and health services
10. Highways and transport
11. Housing
12. Local government
13. National Assembly for Wales
14. Public administration
15. Social welfare
16. Sport and recreation
17. Tourism
18. Town and country planning
19. Water and flood defences
20. Welsh language

---

2.2.15   If the Act simply listed the Subjects set out in Box 2.5 and gave the National Assembly legislative power on all issues that came within that Subject, the National Assembly's powers would be relatively straightforward to understand. However, it is not that simple. Each Subject has text that explains or illustrates what that subject is intended to mean. In the case of 14 out of the 20 subjects, the explanation is in turn followed by Exceptions that apply to that Subject and to all Subjects. There are also general Exceptions. Anything that is covered by an Exception is outside the National Assembly's legislative competence.

2.2.16   The full Schedule is set out in the Government of Wales Act and can be found in Annex C of this report. To give a flavour of the full complexity of the Schedule, Box 2.6 below sets out the exceptions in relation to the first subject in the Schedule.

---

[21] It is worth noting that the extent of devolved powers has increased incrementally since 1999 through transfers of powers from Westminster; two examples are in relation to rail franchises and fire services.

EXHIBIT 2

**Box 2.6: An example of a conferred power**

This box reproduces the first Subject in Schedule 7 of the Government of Wales Act:

***Agriculture, forestry, animals, plants and rural development***

*Agriculture. Horticulture. Forestry. Fisheries and fishing. Animal health and welfare. Plant health. Plant varieties and seeds. Rural development.*

*In this Part of this Schedule "animal" means--*

  *(a)  all mammals apart from humans, and*

  *(b)  all animals other than mammals;*

  *and related expressions are to be construed accordingly.*

Exceptions--

  *Hunting with dogs.*

  *Regulation of scientific or other experimental procedures on animals.*

  *Import and export control, and regulation of movement, of animals, plants and other things, apart from (but subject to provision made by or by virtue of any Act of Parliament relating to the control of imports or exports)--*

  *(a)  the movement into and out of, and within, Wales of animals, animal products, plants, plant products and other things related to them for the purposes of protecting human, animal (or plant) health, animal welfare or the environment or observing or implementing obligations under the Common Agricultural Policy, and*

  *(b)  the movement into and out of, and within, Wales of animal feedstuff, fertilisers and pesticides (or things treated by virtue of any enactment as pesticides) for the purposes of protecting human, animal (or plant) health or the environment.*

  *Authorisations of veterinary medicines and medicinal products.*

2.2.17   The National Assembly can therefore legislate to protect Welsh forests, but cannot legislate on hunting with dogs, which remains the UK Parliament's responsibility. There is a general power to legislate on rural development, but that has to be read against restrictions in other parts of the Schedule that would prevent, say, the creation of a rural business development association. The powers that the National Assembly has to regulate movement of 'animals, plants and other things' (whatever 'other things' is intended to mean) are opaque. Similar points could be made about most of the other Subjects.

2.2.18   There are a number of areas where the National Assembly cannot legislate at all. Any area that is not listed as a devolved power under Schedule 7 of the Government of Wales Act is outside the legislative competence of the National Assembly. There is no comprehensive list of these areas. The main areas that are non-devolved are foreign affairs, defence, policing, immigration and justice, macro-economic policy and the tax and welfare system. The absence of a comprehensive list of non-devolved powers means there can be uncertainty as to

EXHIBIT 2

whether a particular matter is devolved or not. In addition, even in areas that are conferred, there are often exceptions listed in the legislation and even sometimes exceptions to the exceptions (see for example sub-paragraphs (a) and (b) under the third Exception in Box 2.6).

2.2.19  The Welsh Government's evidence highlighted a further complexity in the Welsh devolution settlement. This is a general restriction on National Assembly legislation removing or modifying existing powers of UK Ministers (the restriction is set out in Part 2 of Schedule 7 of the 2006 Act). The 2009 Report of the All-Wales Convention concluded:

*'The problem with this General Restriction is that it seems to introduce an element of uncertainty into the scope of the National Assembly for Wales's law-making powers. There is no composite list of relevant Minister of the Crown functions, therefore how can there be clarity on the extent of the National Assembly for Wales's law-making powers…?'*

2.2.20  Despite these complexities, the scope of the Welsh devolution settlement is quite wide by international standards, with most public services being devolved. One way of measuring the scope of the Welsh devolution settlement is to consider how much public spending in Wales is devolved. In 2012-13, public spending in Wales was around £30 billion, of which £9.2 billion was spent by the Welsh Government, £8.6 billion by local government in Wales (a combination of council tax revenue and funding from the Welsh Government, not included in the figure of £9.2 billion), and £12.1 billion was spent by UK Government departments, including pensions and benefits payments.[22] Thus considerably more than half of public spending is devolved.

2.2.21  Within the United Kingdom, the UK Parliament is sovereign and because of this the National Assembly (like the Scottish Parliament and Northern Ireland Assembly) is a subordinate body. This means that the UK Parliament can legislate on any area it wishes, whether it is devolved or not. However, a convention has arisen whereby the UK Parliament seeks the consent of the National Assembly before legislating in a devolved area. The UK Parliament does not have to abide by any decision of the National Assembly not to give consent, but can legislate regardless.

2.2.22  The legislation that created the National Assembly and Welsh Government (and all other devolved administrations), like all other legislation, can be repealed or amended by the UK Parliament. However, while the United Kingdom does not have a formal written constitution, many consider the devolution Acts within the United Kingdom to be part of a wider set of 'constitutional legislation' in the same vein as legislation like the Parliament Acts of 1911 and 1949, the European Communities Act 1972 or Human Rights Act 1998.[23]

2.2.23  Further information on the Welsh devolution settlement is available in our research paper *Current devolution settlements in the United Kingdom*, published on our website.

---

[22] HM Treasury (2013) *Public Expenditure Statistical Analyses*.

[23] As a practical example of this, the UK Government's Cabinet Manual, published in October 2011 as '*A guide to laws, conventions and rules on the operation of government'*, includes the two Government of Wales Acts as being part of the statutes that underpin the UK constitution.

EXHIBIT 2

## 2.3    DEVOLUTION IN SCOTLAND

2.3.1    Unlike Wales, Scotland voted in favour of devolution in 1979. However, the vote in favour did not meet the legislative threshold of at least 40 per cent of the electorate voting in favour of a Scottish Assembly. Devolution was therefore not introduced in Scotland at that time.

2.3.2    In 1997, a second referendum was also held in Scotland. The people of Scotland voted in favour of the establishment of a Scottish Parliament (with 74.3 per cent of those voting in favour) and in favour of that Parliament having tax-varying powers (with 63.5 per cent of those voting in favour). This was legislated for in the Scotland Act 1998, which created the Scottish Parliament, with primary legislative powers, and the Scottish Executive (now the Scottish Government).

2.3.3    While Wales operates under the conferred powers model of devolution, Scotland operates under the reserved power model. This model of devolution means that the Scotland Act 1998 prescribes those areas where the Scottish Parliament cannot legislate – the reservations. These areas are listed under Schedule 5 of the Act. The Scottish Parliament has powers to make legislation in any area that is not reserved. Given that there is no list of devolved powers the principle of 'if it is not reserved then it is devolved' applies.

2.3.4    Scotland also has more areas of policy devolved to it than Wales, including justice and policing. This reflects the wider range of responsibilities held by the pre-devolution Scottish Office.

2.3.5    Additionally, executive powers were devolved differently in Scotland compared with Wales. Whereas in Wales specific functions were transferred by Transfer of Functions Orders, all executive powers that a Secretary of State would have held in a devolved area were transferred to the Scottish ministers in the Scotland Act 1998 (unless specifically reserved).

2.3.6    In 2008, a Commission was set up to review devolution in Scotland within the context of the United Kingdom by the Labour, Liberal Democrat and Conservative parties, which together formed a majority in the Scottish Parliament. The Commission on Scottish Devolution, or the Calman Commission as it is commonly known after its Chair, Sir Kenneth Calman, reported in June 2009 to the Scottish Parliament and the UK Government.[24] It made a number of recommendations seeking to strengthen Scottish devolution within the United Kingdom. These were mainly in the area of financial accountability,[25] though it also made some recommendations on the re-allocation of responsibilities between the Scottish and UK Parliaments, and on intergovernmental and inter-parliamentary relations.

2.3.7    The result of the Calman Commission's recommendations was the Scotland Act 2012. This amended the Scotland Act 1998 by giving the Scottish Parliament further powers in relation to income tax; new borrowing powers; and the devolution of stamp duty and landfill tax. It also extended devolution in a number of other areas, including speed limits and drink/drive limits.

---

[24] Commission on Scottish Devolution (2009) *Serving Scotland Better: Scotland and the United Kingdom in the 21st Century.*

[25] With the exception of an ability to vary the basic rate of income tax by 3p, the Scottish settlement was like the Welsh settlement in having no taxation or borrowing powers.

EXHIBIT 2

2.3.8   In November 2013 the Scottish Parliament unanimously passed the Scottish Independence Referendum Bill, providing for a referendum to be held on 18 September 2014 on whether Scotland should leave the United Kingdom. This followed the Scottish Parliament election of 2011, when the Scottish National Party was elected as the majority party in the Scottish Parliament on a manifesto which undertook to hold such a referendum. While it does not support independence, the UK Government agreed in October 2012 to extend the competence of the Scottish Parliament to legislate for this referendum.

2.3.9   Further details on the devolution arrangements in Scotland can be found in our research paper *Current devolution settlements in the United Kingdom* published on our website.

### 2.4   DEVOLUTION IN NORTHERN IRELAND

2.4.1   Devolution in Northern Ireland has a long history following the partition of Ireland in 1921, with Northern Ireland having devolved government from its creation until the introduction of direct rule in 1972. The current devolution settlement is a consequence of the Belfast Agreement in 1998, and the St Andrews Agreement of 2006. The Northern Ireland Act 1998 created the Northern Ireland Assembly and the Northern Ireland Executive as a cross-party executive based on power-sharing between the communities of Northern Ireland. The Northern Ireland Assembly has had intermittent periods of suspension, the longest being from 2002 to 2007.

2.4.2   Devolution in Northern Ireland also operates under a reserved powers model, though a different one from Scotland. There are two lists of powers retained by Westminster: 'excepted powers', on which the Northern Ireland Assembly cannot legislate; and 'reserved powers', which are currently reserved to the UK Parliament but may be considered for devolution in the future, and can be legislated for by the Assembly with the agreement of the Secretary of State. Until 2010, powers over justice and policing were 'reserved' but they have now been transferred to the Northern Ireland Assembly.

2.4.3   Northern Ireland has more devolved powers than Wales, including in areas such as energy, policing, justice and social security. This reflects the wide range of powers transferred to Northern Ireland prior to the suspension of devolved government in 1972. As Northern Ireland has the broadest devolution settlement of the three in the United Kingdom, this report refers often to Great Britain, as opposed to the United Kingdom, when discussing matters such as social security or energy.[26]

2.4.4   The Northern Ireland Act 1998 also required Northern Ireland Ministers' participation in the North-South Ministerial Council, for cooperation with the Government of the Republic of Ireland, and in the British-Irish Council, which also includes the UK, Irish, Scottish and Welsh Governments, as well as the Crown Dependencies of the Channel Islands and Isle of Man.

2.4.5   Further details on the devolution arrangements in Northern Ireland can be found in our research paper *Current devolution settlements in the United Kingdom* published on our website.

---

[26] Great Britain excludes Northern Ireland.

EXHIBIT 2

**2.5    DEVOLUTION IN ENGLAND**

2.5.1    There is no England-level government, and England itself does not have a devolution settlement. However, in effect several UK Government departments, such as the Department of Health, have become mainly England-only departments.

2.5.2    There is a form of devolved government in London. The post of Mayor of London was created in 2000. The Mayor has executive responsibility over certain local domestic policies such as policing, transport, some aspects of housing, and some financial powers. The Mayor is scrutinised by the 25-member Greater London Assembly which does not have legislative powers.

2.5.3    There were some proposals at the time of the second elections to the Scottish Parliament and National Assembly for regional devolution in England. A referendum was held in the North East of England in 2004 on a regional Assembly, as proposed by the then UK Government. The referendum rejected the proposal by 77.9 per cent to 22.1 per cent; no further referendums have been held in English regions.

2.5.4    The main context currently for devolution of power within England has been to sub-regional and local communities. The Prime Minister pledged in November 2010: *'We will be the first government in a generation to leave office with much less power in Whitehall than we started with'.*[27] Illustrations of this policy include the Localism Act 2011, which sought to devolve decision-making powers from the UK Government to English councils; the development of sub-regional entities including city regions and local enterprise partnerships;[28] and the introduction of directly elected mayors, subject to local voters' agreement. As these reforms are principally in the realm of devolved areas such as economic development and local government, the Welsh Government could act similarly in Wales if it wished (for example, city regions are being established in Swansea Bay and south east Wales).

2.5.5    In addition to our Commission, the UK Government's Coalition Agreement provided for a second Commission. This Commission would look at the consequences of devolution for the House of Commons. It was launched in February 2012, and is known as the McKay Commission after its Chair, Sir William McKay. The essential remit of the McKay Commission was to examine what is known as the West Lothian question,[29] which asks why MPs from Scotland, Wales and Northern Ireland can vote on legislation which only applies to England, while MPs from England have no comparable rights on devolved matters. Its report was published in 2013 and proposed a mechanism for MPs from England (or England and Wales) whose constituencies alone would be affected by legislation to express their views separately from the House as a whole – a kind of parallel to the legislative consent procedure in the devolved legislatures. They also proposed that a Devolution Committee should be established in the House of Commons to consider devolved implications of UK legislation. At the time we agreed our report, the UK Government had not yet responded.

---

[27] GOV.UK website news story (Nov 2010) *Business Plans Published*.

[28] This includes the implementation of Lord Helseltine's report (2013) *No Stone Unturned*.

[29] So called first by Enoch Powell MP after the then constituency of Tam Dalyell MP – the person who first posed the question.

EXHIBIT 2

2.5.6    When considering possible future developments in Welsh devolution, it is important that English views are taken into account. Box 2.7 refers to some recent research.

---

**Box 2.7: English attitudes towards devolution**

Our first report discussed the Institute of Public Policy Research's (IPPR) 2012 report[30] on English attitudes towards devolution, *The dog that finally barked*. The evidence presented suggested the emergence of what might be called an 'English political community' and concerns within England about the apparent privileges of Scotland. The IPPR followed this in 2013 with IPPR's *England and its two Unions*,[31] which looked further at the demand within England for political expression and analysed any sense of grievance at England's treatment, particularly compared with Scotland. It found that 42 per cent of respondents chose 'How England is governed now that Scotland has a parliament and Wales has an assembly' as a key priority for action or change.

---

### 2.6    INTERNATIONAL COMPARISONS

2.6.1    There are examples all over the world of devolution in federal and non-federal states and countries, and there is a very wide variety of models of decentralisation and devolution. We have looked at a number of international examples to learn from their constitutional structure.[32]

2.6.2    However, we have been acutely aware that, although it has 'quasi-federal' aspects,[33] the United Kingdom is not a federal country, even if as distinguished a commentator as the current Deputy President of the Supreme Court has argued that *'the United Kingdom has indeed become a federal state with a Constitution regulating the relationships between the federal centre and the component parts'.*[34] So there is limited usefulness in comparisons with federations abroad.

2.6.3    Drawing on this international evidence, we concluded that:

- there is no 'one size fits all' model;

- while the evidence does not provide a conclusive comparison of the merits of a 'reserved powers' model over a 'conferred powers' model, there are examples of federations based on 'conferred powers' (such as Belgium and Spain) and on 'reserved powers' (such as the USA, Switzerland and Australia); some also have shared or concurrent powers;

- while there is a complex spectrum of forms of federal government, the reserved powers model appears to be somewhat more common;

---

[30] Richard Wyn Jones, Guy Lodge, Ailsa Henderson and Daniel Wincott (2012) *The dog that finally barked: England as an emerging political community.*

[31] Richard Wyn Jones, Guy Lodge, Charlie Jeffery, Glenn Gottfried, Roger Scully, Ailsa Henderson and Daniel Wincott (2013) *England and its two Unions: The anatomy of a nation and its discontents.*

[32] A useful summary is Majeed, Watts and Brown (2006) *Distribution of Powers and Responsibilities in Federal Countries.*

[33] See, for example, Vernon Bogdanor (2009) *The New British Constitution*: "[Devolution] has transformed Britain from a unitary state to a quasi-federal state" (page 89).

[34] Speech by Baroness Hale to Legal Wales conference, Llandudno, 2012.

EXHIBIT 2

- the scope of powers devolved in the Welsh settlement is quite wide by international standards, covering most public services and many economic development functions. However, the non-devolution of policing and justice appears somewhat anomalous. Some aspects of social welfare tend to be more devolved elsewhere, although the complete devolution of health in Wales is striking;

- the degree of autonomy in devolved policy areas is unusual by international standards, as shown by the fact that the provision of devolved funding (the block grant) from the UK Parliament to the National Assembly is for the most part without conditions. In many federal countries the federal government uses its funding to influence the way in which the states spend the money by attaching conditions;

- in the main, other settlements internationally are more institutionally complex than Wales's, with a greater propensity for overlapping responsibilities and disputes;

- formal mechanisms for intergovernmental cooperation appear to be somewhat undeveloped in the United Kingdom by international standards, although informal mechanisms are also important in the United Kingdom; and

- centralisation and decentralisation tend to ebb and flow over time in federal systems and there are forces pulling in both directions.

2.6.4    We note that Wales appears to be internationally anomalous in three respects:

- it has legislative but not (at present) tax and borrowing powers (though the implementation of our first report will remove this anomaly);

- it has a legislature but not its own devolved courts and judiciary; and

- it is part of a Union where both the conferred and reserved powers models apply in different parts of the Union.

2.6.5    Further details can be found in our research paper *International evidence* published on our website.


**2.7      CURRENT AND FUTURE CONSTITUTIONAL DEVELOPMENTS ACROSS THE UNITED KINGDOM**

2.7.1    Our report is one of a number of recent and future events that will shape the future of the United Kingdom, including the referendum on Scottish independence due in September 2014 and the UK Government's response to the McKay Commission. We have undertaken our work and developed recommendations mindful of this context.

2.7.2    The outcome of the referendum in Scotland on the issue of independence will, no doubt, not just shape the future of devolution in Scotland but have a major impact across the whole of the United Kingdom.

2.7.3    In developing our recommendations, we have been fully aware we are making recommendations within this report against a context of wider constitutional discussions. Irrespective of developments in the wider context, implementation of our recommendations will bring greater stability to Welsh devolution, to Wales's benefit and the benefit of the rest of the United Kingdom.

EXHIBIT 2

**2.8     SUMMARY**

2.8.1    Wales has been subject to more changes in its devolution settlement since 1998 than have Scotland or Northern Ireland. There have been three phases in Welsh devolution: the first two National Assemblies operated under the Government of Wales Act 1998; the 2007 National Assembly operated under the first devolution model contained in the Government of Wales Act 2006; and the National Assembly elected in May 2011 operates under the second devolution model in the 2006 Act.

2.8.2    Wales has fewer powers than Scotland and Northern Ireland and is also the only country in the Union to have a conferred powers model. Wales's settlement is also more complex those that in Scotland or Northern Ireland.

2.8.3    While international comparisons are useful, we recognise the unique nature of the United Kingdom's system of devolution. Wales appears to be anomalous in three respects: it has legislative powers but no taxation or borrowing powers at present; it has a legislature but not its own courts system; and it is part of a Union where different models of devolution are being used.

2.8.4    Future constitutional developments across the United Kingdom, including the referendum on independence in Scotland, will impact on devolution in Wales. We have been mindful of these developments and have recommended changes that will allow both Wales and the United Kingdom to benefit whatever the wider constitutional future.

EXHIBIT 2