1:15-cv-01167-JPO

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

————————

August Term, 2019

Argued: February 5, 2020      Decided: June 8, 2020

Docket No. 19-1262-cv

————————

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Jun 29 2020

PABLO STAR LTD., PABLO STAR MEDIA LTD.,

*Plaintiffs-Appellees,*

— v. —

THE WELSH GOVERNMENT,

*Defendant-Appellant,*

GRACENOTE, DBA Tribune Media Service, PITTSBURGH POST-GAZETTE, E.W.
SCRIPPS, CO., COLORADO NEWS FEED, TRAVEL SQUIRE, RICHMOND TIMES DISPATCH,
MIAMI HERALD MEDIA CO., VISIT WALES, TRIBUNE CONTENT AGENCY, LLC,
JOURNAL MEDIA GROUP, INC., TREASURE COAST NEWSPAPERS, JOHN DOES 1-10,

*Defendants.*

————————

B e f o r e:

POOLER, LYNCH, and PARK, *Circuit Judges.*

————————

Defendant-Appellant the Welsh Government appeals the denial by the United States District Court for the Southern District of New York (Oetken, *J.*) of its motion to dismiss on the ground of sovereign immunity. It argues that the commercial-activity exception of the Foreign Sovereign Immunities Act does not apply to its conduct promoting Welsh culture and tourism in New York because the promotion of tourism is an inherently governmental activity and because its conduct did not have the requisite substantial contact with the United States to trigger the exception under the Act. We disagree, and accordingly AFFIRM the decision of the district court.

———————————

NATHANIEL KLEINMAN (Kevin McCulloch, *on the brief*), The McCulloch Law Firm, PLLC, New York, N.Y., *for Plaintiffs-Appellees.*

RICHARD J. OPARIL, Arnall Golden Gregory LLP, Washington, D.C., *for Defendant-Appellant.*

———————————

GERARD E. LYNCH, *Circuit Judge*:

The Foreign Sovereign Immunities Act ("FSIA") provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States," subject to several enumerated exceptions. 28 U.S.C. § 1604. The exception at issue in this case is the "commercial activity" exception, specifically its first clause, which states that "[a] foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any case . . . in

2

which the action is based upon a commercial activity carried on in the United States by the foreign state." *Id.* § 1605(a)(2). To trigger the exception, the commercial activity must have "substantial contact with the United States." *Id.* § 1603(e).

The United States District Court for the Southern District of New York (J. Paul Oetken, *J.*) denied the Welsh Government's motion to dismiss on the ground of sovereign immunity, holding that the commercial-activity exception applies. The Welsh Government challenges the district court's conclusions on both prongs of the relevant exception. First, it argues that its promotion in the United States of tourism to Wales was not commercial, but rather governmental, in nature. Second, it asserts that, even if its conduct was commercial, it did not have the requisite substantial contact with the United States. As explained below, we find that the Welsh Government did engage in commercial activity in publicizing Wales-themed events in New York, and we further find that the Welsh Government's activity had substantial contact with the United States. We therefore AFFIRM the district court's denial of the Welsh Government's motion.

3

## BACKGROUND

The facts relating to the jurisdictional issue of sovereign immunity are drawn from the record compiled by the district court on the Welsh Government's motion to dismiss, and are for the most part undisputed. The facts regarding the merits of the claims are drawn from the complaint and are taken as true, though we occasionally note instances in which the facts are in dispute.

This case concerns claims for copyright infringement brought by Plaintiffs-Appellees Pablo Star Ltd. ("Pablo Star") and Pablo Star Media Ltd.[1] Pablo Star, which is registered under the laws of Ireland and the United Kingdom, alleges that it owns copyrights in two photographs of the Welsh poet Dylan Thomas and his wife, Caitlin Macnamara. Thomas, who is famous for such works as "Do not go gentle into that good night" and "A Child's Christmas in Wales," spent considerable time in New York in the early 1950s, and died there in 1953. The

---

[1] Plaintiff Pablo Star Media Ltd. was dissolved in 2018. The district court correctly found that its dissolution "does nothing to rebut the standing of at least one Plaintiff to proceed in this action," which "is sufficient to satisfy Article III's case-or-controversy requirement." *Pablo Star Ltd. v. Welsh Gov't*, 378 F. Supp. 3d 300, 314 (S.D.N.Y. 2019), quoting *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). For clarity and simplicity, we use the term "Pablo Star" to refer only to Pablo Star Ltd. in the remainder of this opinion.

first photograph, "Just Married," pictured the couple after their wedding in 1937;
the second, "Penard," shows them playing croquet.

Vernon Watkins took the two photographs. Upon Watkins's death in 1967,
his widow, Gwen Watkins, inherited the copyrights in the photos. In August
2011, Gwen Watkins assigned the copyrights to Pablo Star. Pablo Star then
registered the copyrights with the United States Copyright Office, and was issued
certificates of registration for both works in 2012.[2]

The Welsh Government is a political subdivision of the United Kingdom.
The devolved Welsh Government has authority to promote the well-being of
Wales, including its culture, economic development, and tourism. *See*
Government of Wales Act 2006, c. 32, §§ 60-61. Under its statutory authority
pursuant to the Government of Wales Act, the Welsh Department of Economy,
Skills and Natural Resources is charged with promoting tourism to Wales.

After its formation in 2006, the Welsh Government began using Dylan
Thomas's likeness, including the "Just Married" and "Penard" photographs, to

---

[2] Pablo Star's ownership of the copyrights is disputed. The Welsh Government
has contended that Jeff Towns of "Dylan's Bookstore" acquired the rights to
exploit the copyrights from Gwen Watkins prior to the assignment to Pablo Star,
and that the Welsh Government has a license to use the photographs.

5

promote tourism to Wales. The allegedly infringing materials at issue in this case include a map and brochure entitled "Dylan Thomas Walking Tour of Greenwich Village, New York," which displayed the "Just Married" photograph with a copyright notice beneath stating "Copyright Jeff Towns/Dylan's Bookstore." The walking tour was a collaboration of the Welsh Government and the Thomas family and was run by New York Fun Tours, which charged $25 per ticket for the tour. The Welsh Government also had a page on its website, wales.com, entitled "Discovering the Welsh in America." That page in turn contained a link to a PDF copy of a booklet called "Welsh in America 2010," information about a display exhibition that could be borrowed from the Welsh Government in New York at no cost, and a link to New York Fun Tours' web page regarding its Dylan Thomas walking tours, which would be held on Sundays starting on March 6, 2011. The "Welsh in America" web page featured the "Just Married" photograph with the "Copyright Jeff Towns" notation. All of this material was created before Pablo Star's copyright registration in "Just Married" and "Penard."[3]

---

[3] The complaint alleges that both photographs have been used by the Welsh Government "as part of their advertising, tourism, and promotional campaign." Second Amended Complaint, ¶ 90. In contrast to the detailed information about the use of the "Just Married" photo, however, there are no further details about the alleged use of "Penard."

In 2012, after Pablo Star had registered its copyrights in the two photographs, it discovered that the Welsh Government was using the "Just Married" photograph of Dylan Thomas without its permission. Pablo Star notified the Welsh Government of the unauthorized use and demanded in writing that it cease and desist from using the photograph. Pablo Star alleges that, despite its assurance that it would comply, the Welsh Government continued to use the photograph, including by providing copies to U.S. media companies (the media defendants in the underlying action) for use in articles about Dylan Thomas that promoted tourism to Wales.

In 2013, the Welsh Government developed a new tourism strategy and published a three-year action plan. The strategy and action plan focused on domestic tourism, but also encouraged tourism from Germany, Ireland, the United States, and Canada. As part of its motion to dismiss, the Welsh Government proffered an affidavit from Rob Holt, the Welsh Government's Deputy Director of Tourism Development and Major Events, attesting that the strategy and action plan were developed in Wales and that the computer servers for the Welsh Government's work are maintained in the United Kingdom.

7

Pablo Star filed its initial complaint on February 18, 2015, alleging

copyright infringement by the Welsh Government. After several years of

procedural skirmishing not relevant here,[4] the Welsh Government moved to

dismiss Pablo Star's second amended complaint under Fed. R. Civ. P. 12(b)(1),

asserting sovereign immunity under the FSIA. On March 29, 2019, the district

court denied the motion to dismiss and ordered the Welsh Government to file an

answer. *Pablo Star Ltd.*, 378 F. Supp. 3d at 314. The Welsh Government timely

filed this interlocutory appeal on April 29, 2019.[5]

---

[4] The procedural history of the case can be traced through a number of opinions issued by the district court between 2016 and 2018. *See, e.g.*, *Pablo Star Ltd. v. Welsh Gov't*, 170 F. Supp. 3d 597 (S.D.N.Y. 2016); *Pablo Star Ltd. v. Welsh Gov't*, 2016 WL 2745849 (S.D.N.Y. 2016); *Pablo Star Ltd. v. Tribune Content Agency, LLC*, 2017 WL 902140 (S.D.N.Y. 2017); *Pablo Star Ltd. v. Welsh Gov't*, 2018 WL 2041715 (S.D.N.Y. 2018).

[5] We have appellate jurisdiction under the collateral-order doctrine, which "allows an immediate appeal from an order denying immunity under the FSIA." *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007) (internal quotation marks omitted). We review a district court's decision concerning subject matter jurisdiction under the FSIA for clear error as to factual findings and *de novo* as to legal conclusions. *Id*.

8

# DISCUSSION

## I.     The FSIA

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign

state in federal court." *Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d

171, 174-75 (2d Cir. 2010), quoting *Argentine Republic v. Amerada Hess Shipping

Corp.*, 488 U.S. 428, 439 (1989). "Under the Act, a foreign state is presumptively

immune from the jurisdiction of United States courts; unless a specified exception

applies, a federal court lacks subject-matter jurisdiction over a claim against a

foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).

A defendant seeking sovereign immunity bears the burden of establishing

a prima facie case that it is a foreign sovereign. *Anglo-Iberia*, 600 F.3d at 175. Here,

it is undisputed that the Welsh Government, as a subdivision of the United

Kingdom, is a foreign state within the meaning of the Act, and is presumptively

entitled to sovereign immunity. *See Pablo Star*, 170 F. Supp. 3d at 602; *see also* 28

U.S.C. § 1603(a); Government of Wales Act, c. 32, § A1 ("[T]he Welsh

Government ... [is] a permanent part of the United Kingdom's constitutional

arrangements.").

9

Once the defendant makes that showing, the burden shifts to the plaintiff

to make an initial showing that an enumerated exception to sovereign immunity

applies. *Anglo-Iberia*, 600 F.3d at 175. Determining whether that burden is met

involves a review of the allegations in the complaint and any undisputed facts,

and resolution by the district court of any disputed issues of fact. *Id.* The district

court may look to evidence outside the pleadings and may hold an evidentiary

hearing, if one is warranted, in determining facts relevant to jurisdiction. *Id.* Once

the plaintiff has met its initial burden of production, the defendant bears the

burden of proving, by a preponderance of the evidence, that the alleged

exception does not apply. *Id.* In other words, the ultimate burden of persuasion

remains on the party seeking sovereign immunity. *Id.*

## II. The Commercial-Activity Exception

The FSIA's commercial-activity exception abrogates sovereign immunity in

cases in which the action is:

> based [i] upon a commercial activity carried on in the
> United States by the foreign state; or [ii] upon an act
> performed in the United States in connection with a
> commercial activity of the foreign state elsewhere; or
> [iii] upon an act outside the territory of the United States
> in connection with a commercial activity of the foreign
> state elsewhere and that act causes a direct effect in the
> United States.

10

28 U.S.C. § 1605(a)(2). In this case, only the first clause of the commercial-activity exception is at issue.

The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." *Id.* § 1603(d). As the Supreme Court has noted, this definition "leaves the critical term 'commercial' largely undefined." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 612 (1992). Of particular significance to this case, "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). A "commercial activity carried on in the United States by a foreign state" is defined as "commercial activity carried on by such state and having substantial contact with the United States." *Id.* § 1603(e).

The district court concluded both that the acts of the Welsh Government on which the claims in this case are based constituted commercial activity and that that activity had substantial contact with the United States. The Welsh Government challenges both conclusions.

III.     **Analysis**

A.     **The Welsh Government Engaged in Commercial Activity.**

We begin by identifying the particular conduct on which Pablo Star's

action is "based" under the FSIA. *Nelson*, 507 U.S. at 356. For purposes of the

commercial-activity exception, the relevant "activity" on which the claims are

based is the Welsh Government's use of the photographs in question in

promoting Wales-related tourist activities, specifically, on its wales.com web

page; in the "Welsh in America 2010" booklet, the "Welsh in America" exhibition

available from the Welsh Government in New York, and the "Dylan Thomas

Walking Tour of Greenwich Village, New York" brochure; and in providing the

photographs to media companies for publication in articles about Wales and

Dylan Thomas.

Whether an activity is deemed "commercial" under the FSIA depends on

its "nature" rather than its "purpose," 28 U.S.C. § 1603(d), where "purpose" is

"the *reason* why the foreign state engages in the activity" and "nature" is "the

*outward form* of the conduct that the foreign state performs or agrees to perform,"

*Nelson*, 507 U.S. at 361 (second emphasis added).

12

The Supreme Court has elaborated on that standard in two principal cases. In *Republic of Argentina v. Weltover, Inc.*, the Supreme Court explained that in applying the nature-versus-purpose analysis, "the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" 504 U.S. at 614 (internal citation omitted) (emphasis in original). The *Weltover* Court gave the example that "a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is 'commercial' activity, [notwithstanding that the purchases are designed to support the sovereign function of national defense,] because private companies can similarly use sales contracts to acquire goods." *Id.* at 614-15. Thus, in *Weltover*, the Argentine government's sale of bonds constituted commercial activity, because borrowing funds through the bond market is an activity regularly conducted by private companies as well as by governments, notwithstanding that the funds raised would be used to support sovereign governmental programs. *Id.* at 615-17.

13

In the same vein, the Court stated in *Saudi Arabia v. Nelson* that a foreign

state engages in commercial activity "where it exercises only those powers that

can also be exercised by private citizens, as distinct from those powers peculiar to

sovereigns." 507 U.S. at 360 (internal quotation marks omitted). Thus, in that

case, the Kingdom of Saudi Arabia enjoyed immunity from a lawsuit alleging

that the plaintiff was unlawfully detained and tortured in retaliation for

reporting safety violations at the Saudi hospital where he worked. However

reprehensible the conduct alleged, the exercise – including the abuse – of the

police powers of detention and punishment are uniquely sovereign activities. *Id.*

at 361.

This is a standard more easily stated than applied, however, and its

application may sometimes depend on the level of generality at which the

conduct is viewed. Separating the "nature" from the "purpose" of an activity

may require a nuanced examination of the context of the acts involved. In this

case, for example, the narrowest possible characterization of the challenged

actions — printing and distributing copies of photographs, or "engaging in

copyright infringement" — plainly describes "powers that can [ ] be exercised by

private citizens, as distinct from [ ] powers peculiar to sovereigns." *Nelson*, 507

14

U.S. at 360 (internal quotation marks omitted). Literally anyone can do those things, and such actions are regularly performed by private parties. But without some understanding of context, that is not much help in distinguishing sovereign from commercial conduct. And indeed, such a narrow approach would have pointed in a different direction in the very case from which the formulation is drawn. It might be entirely reasonable to characterize the actions to which Nelson was subjected as "locking someone in a room, depriving him of food, and severely beating him," or simply as "kidnapping and aggravated assault" — and indeed, Nelson so characterized them. Those are activities in which criminals who are private citizens engage with regrettable frequency, and are not actions that only the agents of sovereign states can perform. But that would ignore the context in which the events took place. The involvement of agents of the state security services was an important part of defining the activity being assessed.[6]

_____

[6] Indeed, in an opinion concurring in the judgment, Justice White suggested that "had the hospital retaliated against Nelson by hiring thugs to do the job, I assume the majority—no longer able to describe this conduct as 'a foreign state's exercise of the power of its police,' *ante*, at [361]—would consent to calling it 'commercial.' For, in such circumstances, the state-run hospital would be operating as any private participant in the marketplace and respondents' action would be based on the operation by Saudi Arabia's agents of a commercial business." 507 U.S. at 366.

On the other hand, a very broad characterization of the activity that forms the basis of the claim would tend to conflate the act with its purpose. Here, for example, the Welsh Government asserts that it was acting to promote Welsh culture and tourism pursuant to its statutory mandate under the Government of Wales Act 2006, and thus that it was acting as a sovereign government. That may be a reasonable way to describe the Welsh Government's actions here, but that description characterizes those actions in terms of their broad purposes as much as their "outward form." Like the Argentine government in *Weltover*, the Welsh Government's actions here are not undertaken from "a profit motive," but rather with the goal of enhancing the image of the country and the prosperity of its citizens — legitimate purposes for a sovereign to pursue.

Those, however, are the purposes or *reasons* for the Welsh Government's actions, and not what it did to accomplish its goals. The means by which it pursued its goals was the publication, on-line and in print, of what are essentially advertising materials. As Pablo Star argues, that is an activity that could be, and in fact regularly is, performed by private-sector businesses. The district court agreed, holding that "[t]he Welsh Government's use of these photos is an eminently familiar manifestation of the manner in which any number of private

16

travel agents or guides have been alleged to have used another's copyrighted materials to supplement their own products or services." *Pablo Star*, 378 F. Supp. 3d at 309-10.

We agree as well. Indeed, even if the broader characterization "promoting tourism" is used, that does not distinguish the activity from functions regularly undertaken by private entities. Airlines, travel agents, hotels, operators of theme parks, and sponsors of arts festivals, to name but a few, regularly endeavor to promote tourism to particular locations. Nor is that private activity always limited to the promotion of the particular entity's own goods or services. Airlines, travel agents, and hotels commonly promote the entertainment or cultural opportunities available in particular cities or countries, which they do not own and from which they do not directly profit. All that distinguishes their advertising from that of the Welsh Government here is that their ultimate purpose is indeed profit — the airline hopes that if you are excited by its television commercial about the pleasures to be had at a destination to which it flies, you may be motivated to buy a ticket on one of its flights — while the Welsh Government's reasons for promoting particular touristic activities is not. But, as *Weltover* makes clear, the lack of a profit motive is irrelevant to the determination

17

of whether the activity is "commercial" for purposes of the FSIA. *Weltover*, 504
U.S. at 614.

In arguing that "promoting tourism" is inherently sovereign and non-
commercial, the Welsh Government relies heavily on our decision in *Kato v.
Ishihara*, 360 F.3d 106 (2d Cir. 2004). The plaintiff in *Kato* was a Japanese citizen
employed by the Tokyo Metropolitan Government ("TMG") in its New York
office. She brought a sexual harassment suit against TMG and the Tokyo
governor, alleging sex discrimination and retaliation in the course of her
employment in violation of Title VII of the Civil Rights Act of 1964. We agreed
with TMG's argument that it was immune from suit under the FSIA.

TMG performed actions that were superficially similar to those typically
undertaken by private parties. For example, TMG engaged in "product
promotion for Japanese companies, general business development assistance,
participation in trade shows on behalf of the companies to promote those
companies' products for sale, and leasing office space to those companies for
their business development." 360 F.3d at 111 (internal quotation marks omitted).
However, this Court found that "[a]lthough a private Japanese business might
engage in these activities on its own behalf—for example, by sending its

representatives to trade shows in the United States to promote its products—such a business would not typically undertake the promotion of other Japanese businesses, or the promotion of Japanese business interests in general." *Id.* at 112. Thus, "the fact that a government instrumentality like TMG is engaged in *the promotion of commerce* does not mean that the instrumentality is thereby engaged in *commerce*." *Id.* (emphasis in original).

The Welsh Government seizes on the Court's language in *Kato* to argue that it too was performing quintessentially governmental functions. Specifically, it says that it was acting pursuant to its statutory authority granted by the government of the United Kingdom to promote the well-being of Wales, including by promoting economic development, tourism, and culture abroad.

The Welsh Government takes *Kato*'s language out of its factual context, however. First, the Welsh Government here engaged in promotional activities "on its own behalf," *id.* at 112, rather than on behalf of third parties. In addition, TMG's actions promoting Japanese business interests abroad were not the conduct on which Kato's action was "based." Instead, Kato's claimed injury was based on TMG's alleged harassing and retaliatory conduct. That activity was a part of TMG's personnel practices. Our inquiry in *Kato* was thus directed to

19

assessing whether the plaintiff was a *bona fide* public servant rather than toward

deciding whether activities such as those of the Welsh Government here are

properly characterized as "commercial."

*Nelson* established the importance of a sufficient "nexus" between a

defendant's conduct and the injuries alleged. 507 U.S. at 355. In *Nelson*, a Saudi

government hospital recruited and hired Nelson as a monitoring systems

engineer. *Id.* at 351-52. When Nelson discovered and reported safety defects that

endangered patients' lives to hospital officials and a Saudi government

commission, he was arrested and tortured by government agents. *Id.* at 352-53. In

evaluating Saudi Arabia's assertion of sovereign immunity, the Supreme Court

reasoned that, while the Saudi defendants recruited Nelson, signed an

employment contract with him, and subsequently employed him, these activities

(which could be considered commercial) were not the basis for his lawsuit.

Instead, his lawsuit sought damages for defendants' wrongful arrest,

imprisonment, and torture, and that conduct "fails to qualify as 'commercial

activity' within the meaning of the [FSIA]." *Id.* at 358. Thus, because there was no

sufficient "nexus" between Nelson's injuries and the government hospital's

commercial activity, the commercial-activity exception did not apply and Saudi

Arabia was entitled to sovereign immunity.

Similarly, in *Kato*, the plaintiff's alleged injuries were not based on TMG's promotion of Japanese business interests abroad but on TMG's alleged harassing and retaliatory conduct as an employer of civil servants. Indeed, the *Kato* Court based its decision in part on the fact that Kato was a civil servant and that the FSIA's legislative history identified employment of civil service personnel as an example of governmental activity. *Kato*, 360 F.3d at 111, citing H.R. Rep. No. 94-1487, at 16, *reprinted in* U.S.C.C.A.N. at 6615. Our statement that "an agency of a foreign government is not involved in 'commercial activity' under the FSIA when it provides general business development assistance," 360 F.3d at 114, was thus in the context of determining whether the plaintiff was properly characterized as a civil servant. Because the promotion of a country's commercial activities is a legitimate function of government, she was.

Pablo Star's argument does not depend on any claim that the employees of the Welsh Government who engaged in the challenged activity here were part of a commercial, rather than governmental, operation. Here, unlike in *Nelson* and *Kato*, Pablo Star's alleged injuries are based directly on the Welsh Government's allegedly commercial conduct, specifically the unauthorized use of photographs in promotional websites and printed materials advertising tourism related to

21

Wales. And, as the district court reasoned in its opinion below, private travel

agents, publishers of guidebooks, and airline companies can and do use

photographs to promote tourism to various destinations around the world. If any

of those institutions had used Pablo Star's copyrighted photos to promote the

Dylan Thomas Walking Tour of Greenwich Village (for which New York Fun

Tours, apparently a for-profit enterprise, charged admission), it would have been

a proper defendant in a copyright infringement action. Every aspect of the Welsh

Government's *conduct* that forms the basis of Pablo Star's claim could have been

done by a private party for commercial gain. Thus, unlike the exercise of state

police power in *Nelson*, 507 U.S. at 361, there is nothing quintessentially

governmental about using a photograph in a printed brochure or on a web page

or distributing the photograph to newspaper outlets to advertise or promote

travel and tourism to a particular location. The fact that this activity was done by

a government body pursuant to its statutory authority in order to promote

tourism, rather than to make a profit, goes to the activity's purpose rather than its

"outward form." *Nelson*, 507 U.S. at 361. *See also Leutwyler v. Office of Her Majesty*

*Queen Rania Al-Abdullah*, 184 F. Supp. 2d 277, 291 (S.D.N.Y. 2001) ("[W]hile the

*purpose* of publishing the diary may have been governmental (disseminating

22

information about Jordan and encouraging tourism), the *nature* of the activity

(publishing and selling books) is clearly commercial." (emphasis in original)). We

therefore conclude that the activity on which Pablo Star's claims are based is

commercial activity.

### B.   The Welsh Government's Conduct Had Substantial Contact with the United States.

Having found that the Welsh Government engaged in commercial activity,

we move on to the second step of the inquiry: whether the commercial activity

was carried on in the United States. To qualify, the commercial activity must

have "substantial contact with the United States." 28 U.S.C. § 1603(e).

Exactly what constitutes "substantial contact" for purposes of the FSIA is

poorly defined. "Congress left it to the courts to define the contours of

'substantial contact' between a foreign state's commercial activity and the United

States. However, it is clear that Congress intended a tighter nexus than the

'minimum contacts' standard for due process." *Shapiro v. Republic of Bolivia*, 930

F.2d 1013, 1019 (2d Cir. 1991) (internal citation omitted). In *Shapiro*, we concluded

that Bolivia's issuance of promissory notes to a Delaware corporation doing

business principally in New York City, which were then placed in escrow with a

Washington, D.C. law firm, satisfied the "substantial contact" standard. *Id.* We stated that "[w]e know of no theory that would cause us to read the FSIA to allow a foreign state to issue bearer notes to an intermediary in the United States and then to deny that it was engaged in commercial activity as defined in the FSIA. The very presence of such highly transferable instruments, whether or not the initial holder successfully discounts them in the country, suffices to satisfy the 'substantial contact' requirement of the statute." *Id.*

The district court below held that the substantial contact requirement was satisfied in this case because it found that the Welsh Government played an active role in the United States in the development and distribution in New York of promotional materials that included plaintiffs' photographs, including by contracting with private businesses located in New York City to publish, print, display, and distribute the allegedly infringing materials. *Pablo Star*, 378 F. Supp. 3d at 313.

The Welsh Government argues that all relevant activity took place in Wales or the United Kingdom. For example, the Welsh Government's tourism strategy and action plan to promote tourism were formulated in Wales and all electronic storage and distribution of the photographs occurred from computers and

24

servers located in the United Kingdom. Joint App'x at A-313. In response to the

district court's emphasis on the fact that it was the "Welsh Government *in New*

*York*" that engaged in commercial activity, *Pablo Star*, 378 F. Supp. 3d at 313

(emphasis in original), the Welsh Government says that all of its offices in the

United States were located in the United Kingdom's embassies and consulates,

Joint App'x at A-312, and that, under the Vienna Convention on Consular

Relations, having an office at a foreign embassy or consulate does not provide a

proper basis to invoke the commercial-activity exception. *See* Vienna Convention

on Consular Relations, 596 U.N.T.S. 261 (Apr. 24, 1963), Art. 5(b), Art. 43

("Consular officers and consular employees shall not be amenable to the

jurisdiction of the judicial or administrative authorities of the receiving State in

respect of acts performed in the exercise of consular functions.").

We agree with the district court that the Welsh Government's commercial

activity utilizing Pablo Star's copyrighted photographs had substantial contact

with the United States. The point here is not whether the Welsh Government

maintained an office in New York, or whether that office was located in a

consulate or a commercial office building. The Welsh Government's conduct in

New York reached beyond the confines of its consular office. The very title of its

New York campaign was "The Welsh *in America"* (emphasis added). The Government provided a 14-panel exhibition on the history of the Welsh in America for display in American venues. The Welsh Government distributed the Dylan Thomas photographs to American media companies, which printed stories containing one or both photographs in local newspapers in cities including Pittsburgh, Richmond, and Miami. And, most persuasively, the Dylan Thomas Walking Tour of Greenwich Village was organized by New York Fun Tours in cooperation with the Welsh Government, and the Welsh Government provided a map and brochure for the tour (featuring the "Just Married" photograph) that could have been useful only if distributed for use in New York. *See Pablo Star*, 378 F. Supp. 3d at 312. Some or all of those materials were printed by New York companies under contract with the Welsh Government. Taken together, this evidence clearly demonstrates that the Welsh Government's commercial activity had substantial contact with the United States.

## CONCLUSION

For the reasons stated above, we conclude that Pablo Star's lawsuit is "based . . . upon a commercial activity carried on in the United States," 28 U.S.C. § 1605(a)(2), and therefore falls within an exception to the immunity recognized by the FSIA. We have considered the Welsh Government's remaining arguments and have found them to be without merit. We therefore AFFIRM the judgment of the district court.